RITCHIE ENTERPRISES, a Kansas partnership, Plaintiff,

v.

HONEYWELL BULL, INC., Defendant.

No. 86–1394–C.

United States District Court, D. Kansas.

Jan. 17, 1990.

Robert L. Howard, Foulston & Siefkin, Wichita, Kan., for plaintiff.

Joseph W. Kennedy, Morris, Laing, Evans, Brock & Kennedy, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

CROW, District Judge.

The case comes before the court on the motion of defendant, Honeywell Bull, Inc. (Honeywell), for partial summary judgment. Alleging the defendant made material misrepresentations and omissions of fact which induced it to purchase a Honeywell DPS6/40 mainframe computer, plaintiff, Ritchie Enterprises (Ritchie), brings this action to recover for damages sustained from the failure of the computer to perform consistent with defendant's representations or to meet the plaintiff's needs and specifications. Besides its fraud claims, plaintiff seeks relief upon the following theories: negligent misrepresentation, breach of both express and implied warranties, breach of the implied covenant of good faith and fair dealing, and breach of fiduciary duty. Conceding issues of material fact exist as to plaintiff's fraud claim, defendant moves for summary judgment on all other claims of the plaintiff. Plaintiff's request for oral argument is denied, as it would not materially assist the court in deciding the motion.

In ruling on a motion for summary judgment, the trial court conducts a threshold inquiry of the need for a trial. Without weighing the evidence or determining credibility, the court grants summary judgment when no genuine issue of material fact exists and the movant is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252, 106 S.Ct. at 2512.

An issue of fact is "genuine" if the evidence is significantly probative or more than merely colorable such that a jury could reasonably return a verdict for the nonmoving party. *Id.* at 248, 106 S.Ct. at 2510. An issue of fact is "material" if proof thereof might affect the outcome of the lawsuit as assessed from the controlling substantive law. 477 U.S. at 249, 106 S.Ct. at 2510. Where reasonable minds would not differ over the import of the evidence and could only reach one conclusion as to the evidence, summary judgment is appropriate. 477 U.S. at 250, 106 S.Ct. at 2511.

The movant's initial burden under Fed.R. Civ.P. 56 is to show the absence of evidence to support the nonmoving party's case. *Windon Third Oil and Gas v. Federal Deposit Ins.*, 805 F.2d 342, 345 (10th Cir. 1986), *cert. denied* 480 U.S. 947, 107 S.Ct. 1605, 94 L.Ed.2d 791 (1987). The movant must specify those portions of " 'the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits if any,' " which demonstrate the absence of a genuine issue of fact. *Windon*, 805 F.2d at 345 (quoting Fed.R.Civ.P. 56(c)). "[C]onclusory assertions to aver the absence of evidence remain insufficient to meet this burden." *Windon*, 805 F.2d at 345 n. 7. The movant, however, does not have the burden to prove a negative, that is, to disprove the nonmoving party's evidence. *Id.* at 346. It may be sufficient for the movant to establish that the alleged

factual issues are without legal significance. *Dayton Hudson Corp. v. Macerich Real Estate Co.*, 812 F.2d 1319, 1323 (10th Cir.1987).

The opposing party may not rest upon mere allegations or denials in the pleadings but must set forth specific facts supported by the kinds of evidentiary materials listed in Rule 56(c). *Anderson*, 477 U.S. at 250, 106 S.Ct. at 2511. The nonmoving party's evidence is deemed true and all reasonable inferences are drawn in his favor. *Windon*, 805 F.2d at 346. More than a "disfavored procedural shortcut," summary judgment is an important procedure "designed 'to secure the just, speedy and inexpensive determination of every action.' Fed.R. Civ.P. 1." *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986).

Before identifying the uncontroverted facts, the court must resolve a procedural issue concerning what evidence may be considered on summary judgment. Plaintiff's statement of uncontroverted facts is for the most part based upon a written chronology and description of events prepared by one of plaintiff's employees, Jay West, at the request of plaintiff's attorneys. This document is comprised of approximately 47 pages of typewritten material. Jay West avers that this chronology was prepared from his review of information and documents found in his own files and his staff's files, as well as, his recollection of the events. This chronology was used extensively in the taking of Jay West's deposition. Defendant objects to plaintiff's use of this document in opposing summary judgment, as it is an unsworn statement containing inadmissible hearsay.

■■■ Contrary to plaintiff's position, evidence must be admissible at trial before it can be considered on a motion for summary judgment, unless its admissibility is unchallenged. *Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 365 n. 14 (7th Cir.), *cert. denied*, 484 U.S. 820, 108 S.Ct. 79, 98 L.Ed.2d 42 (1987). Courts have excluded from their consideration in summary judgment proceedings such evidence as unsworn documents, *Martin v. John W.*

*Stone Oil Distributor, Inc.*, 819 F.2d 547, 549 (5th Cir.1987); hearsay statements in notes, *Colan*, 812 F.2d at 365 n. 14; and hearsay evidence in depositions or affidavits, *Gamboa v. Washington*, 716 F.Supp. 353, 362 (N.D.Ill.1989). The Supreme Court did state in *Celotex* that the nonmoving party need not produce evidence in a form which would be admissible at trial. However, the context for this broad statement is delineated by the Court's subsequent sentences which state that a nonmoving party is not required to depose his own witnesses and that he may rely on the evidentiary materials listed in Rule 56(e), including affidavits. 477 U.S. at 324, 106 S.Ct. at 2553. Fed.R.Civ.P. 56(e) provides in pertinent part: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence...." A chronology of events prepared sometime after their occurrence, at the request of counsel and in apparent anticipation of litigation, does not fall within any of the hearsay exceptions argued by plaintiff. The court will apply these same principles in determining the uncontroverted facts in this summary judgment motion.

For purposes of this motion, the following facts are uncontroverted.

1. Plaintiff Ritchie is a Kansas general partnership with its principal place of business in Kansas. Plaintiff conducts its business through solely owned subdivisions, including Ritchie Oil Co., Ritchie Energy, Ritchie Associates, Inc., and Ritchie Corporation. Ritchie Corporation in turn owns several subsidiaries, including Ritchie Paving, Inc., Ritchie Sand Co., and Allen's Concrete, Inc., which are in the business of asphalt paving, sand, and concrete readimix.

2. Defendant Honeywell is a Delaware corporation with its principal place of business in Massachusetts.

3. Plaintiff had purchased several computers from defendant before it purchased the DPS 6/40 which is the subject matter of this lawsuit. Ritchie's third purchase from defendant was a Honeywell DPS–330. This purchase contract was signed by

David Buchholz, Ritchie's chief financial officer, in November of 1980 and took effect on December 19, 1980. This contract became the parties' "Basic Agreement" as all subsequent purchases were made subject to this contract and were simply added as amendments to the Basic Agreement. Before delivery of the DPS–330, defendant announced a new model, DPS/7, which had the same capabilities of the DPS–330 but with more growth capacity. Defendant offered to let plaintiff switch to the DPS/7 and informed it that the peripheral equipment such as printers could be moved to the DPS/7. Plaintiff later learned that a $17,000 printer it had ordered for the DPS–330 could not be used with the DPS/7. Upset over this discovery, Mr. Buchholz met with defendant's regional marketing manager, Ed Evans, and tape-recorded their meeting. This problem was eventually resolved with Honeywell providing plaintiff a $17,000 service credit. The Basic Agreement was then amended to apply to the DPS/7.

4. During the purchasing negotiations for the DPS/7 in 1981, Jay West, Ritchie's data processing manager, began maintaining a chronological list of purchases and communications with defendant. West explained that he considered the list necessary because of his experience with Honeywell where problems were unsatisfactorily resolved when it was only our word against their word.

5. Sometime after September of 1980, plaintiff decided to automate its order entry system which was then handled manually. Mr. Buchholz informed defendant of Ritchie's goal to have the automation complete by late summer of 1982. Ritchie also planned ultimately to market its automated order entry system to similar companies in the asphalt paving and readi-mix cement business.

6. In September of 1982, the plaintiff's data processing steering committee decided after numerous meetings with Honeywell personnel that the order entry system should be used on a distributed processing, or decentralized computer, rather than the DPS/7 which was a centralized computer.

At this point, Honeywell considered the Honeywell DPS/6 line of mini-computers and also looked into a Digital Equipment Company (DEC) computer sold by a company in Oklahoma City. During this time, Jay West often obtained the advice of Brian Loether, defendant's technical representative in the Wichita area. Jay West had previously worked with Brian Loether as a co-employee in another business and had had a social relationship with him as well. Ritchie considered several different models of the Honeywell DPS/6 line in drafting the specifications for its order entry system. Defendant provided Ritchie with various brochures and Mr. Loether suggested alternative combinations of equipment. Ritchie decided to go with the DPS6/40 in September of 1983, as Mr. West was convinced the computer system was sufficient for Ritchie after discussing the various models with Mr. Loether. (Plaintiff has not cited to any evidence of record which controverts these statements.)

7. Ritchie completed the specifications for its order entry system on September 1, 1983, and requested bids for the application software from three companies: Honeywell, CD Systems, Inc., and Technalysis. The specifications called for the use of the Honeywell DPS6/40 and operating software. Ritchie accepted the lowest bid, which was from CD Systems. In April of 1984, CD Systems cancelled its bid, and Ritchie decided to code the order entry system application software itself. Of the sixty programs coded, approximately four were done by Honeywell representatives and were considered to be the easier functions. The coding of the application software was completed in December of 1984.

8. In the meantime, David Buchholz signed the contract for the purchase of the Honeywell DPS6/40 on January 16, 1984. The "Agreement Amendment" for the DPS6/40 expressly referenced the previous Basic Agreement of December 19, 1980, for the purchase of DPS–330. The parties agreed in a provision just above the signature line that all terms of the Basic Agreement remain in full force and effect. The total purchase price paid for the hardware,

operating software and peripheral equipment was approximately $55,000.00. Ritchie took delivery of the computer in late May of 1984.

9. During the coding process, Ritchie claims it discovered that certain misrepresentations were made by Honeywell about the capabilities of the DPS6/40. Honeywell allegedly misrepresented the "file to file" transfer capabilities of the DPS 6/40, its ability to lock records at the record level rather than at the control interval or block level, the adequacy of its memory for Ritchie's order entry system, its capacity to handle signed fields and to meet Ritchie's needs, and the problems that Honeywell was experiencing with this line of computers.

10. After the equipment was installed in early 1985, Ritchie began parallel testing the automated order entry system and the manual system in February of 1985. Due to numerous problems with the automated system, the parallel testing continued for six months instead of the planned thirty days.

11. Ritchie claims that the problems revealed in the coding and testing periods resulted in additional misrepresentations by Honeywell, in particular: 1) In June of 1984, Honeywell provided a "patch" to repair a "deferred print" problem without disclosing that the patch would cause a new problem; 2) Around the same time, Honeywell informed Ritchie that a new release would solve the "blinking fields" problem, but the new release failed; 3) Honeywell failed to reveal other problems it had experienced with the DPS6/40 and for which patches had been developed.

12. Defendant made some effort to correct or to repair plaintiff's problems with the DPS6/40. The adequacy, effectiveness, and timeliness of defendant's efforts are contested factual issues. Ritchie's problems allegedly continued and plaintiff decided to "unplug" the DPS6/40 in August of 1985.

13. The Basic Agreement of December 19, 1980, provides in pertinent part:

3.1 Customer's exclusive remedy and Honeywell's entire liability for equipment, Software Products, Auxiliary Products, documentation and services is set forth in the Supplements, Schedules and Addenda, as applicable, listed in Section 1.

3.2 In no event is Honeywell liable for any indirect, special or consequential damages arising out of the Agreement or the use of any equipment, Software Products, Auxiliary Products, documentation and services provided under the Agreement.

The Basic Agreement also contains the following warranty disclaimer:

There are no express or implied warranties, including the implied warranties of merchantability and fitness for a particular purpose, not specified herein respecting the Agreement or the equipment, Software Products, Auxiliary Products, documentation and services provided.

The Basic Agreement expressly warrants only clear title and freedom from defects in workmanship or material. At the same time, the Agreement limits the remedy for breach of these express warranties to the following:

Customer's exclusive remedy and Honeywell's entire liability in contract, tort or otherwise for equipment is the repair or exchange of any parts which Honeywell determines during the applicable warranty period are defective in workmanship or material. All exchanged parts are the property of Honeywell. If, however, after repeated efforts, Honeywell is unable to repair or exchange such a defective part, then Customer's exclusive remedy and Honeywell's entire liability in contract, tort or otherwise is the payment by Honeywell of actual damages in an amount not to exceed the amount paid for the irreparable device.

The Basic Agreement also contains the following integration clause:

The Agreement represents the entire agreement between the parties regarding the subject matter thereof and supersedes all prior oral and written proposals and communications.

The parties also agreed therein that:

The Agreement is governed by the law of the Commonwealth of Massachusetts.

14. Although Mr. Buchholz cannot recall specifically reviewing the Basic Agreement on behalf of Ritchie, Mr. Evans remembers that the contract was negotiated between Ritchie's attorneys, Mr. Buchholz, and Honeywell's attorneys. In fact, agents of Ritchie requested certain changes in the contract, such as when title passed in the equipment, which were eventually approved by Honeywell's legal staff. Mr. West recalls reviewing the contract and having Ritchie's attorneys also review the contract.

The court has reviewed the submitted copy of Jay West deposition exhibit 90 and the corresponding portions of the Jay West deposition which were provided in plaintiff's supplemental response. As defendant's contentions do not turn upon most of the facts found in those exhibits, the court sees little reason to outline the factual basis for plaintiff's claims of fraudulent misrepresentation.

## CHOICE OF LAW

■ Since this court is acting upon diversity jurisdiction, it must apply the choice of law rules of the forum state, Kansas. *Klaxton Co. v. Stentor Elec. Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *Missouri Pac. R. Co. v. Kansas Gas & Elec. Co.*, 862 F.2d 796, 798 n. 1 (10th Cir.1988). The Uniform Commercial Code (Code), as adopted in Kansas, recognizes that parties may agree for the law of another state to govern their rights and duties so long as the transaction at issue has "a reasonable relation" to that state. K.S.A. 84–1–105(1). *See National Equip. Rental, Ltd. v. Taylor*, 225 Kan. 58, 60–61, 587 P.2d 870 (1978). Massachusetts law will govern the contract claims in this case by virtue of the choice of law provision in the Basic Agreement.

In a tort action, Kansas courts apply the doctrine of *lex loci delicti*, where the wrong occurred. *Hawley v. Beech Aircraft Corp.*, 625 F.2d 991, 993 (10th Cir. 1980); *Ling v. Jan's Liquors*, 237 Kan. 629, 634, 703 P.2d 731 (1985). Where the wrong occurred is generally considered to be the place where the injury was suffered.

*Ling*, 237 Kan. at 634, 703 P.2d 731. Under this doctrine, Kansas law would govern the plaintiff's fraud claim. Defendant contends this doctrine should not be applied and, instead, the court should follow the parties' choice of Massachusetts law found in the Basic Agreement. Defendant's reason is apparent as Kansas law allows punitive damages on fraud claims while Massachusetts law does not.

For the following reasons, the court holds that Kansas law will govern the plaintiff's tort claims. First, even though Kansas courts have not specifically addressed whether a contract choice of law provision will apply to related tort claims, Kansas law is settled concerning the application of *lex loci delicti* to tort claims. It is neither the prerogative nor the function of the federal district court to challenge the wisdom of or to change the forum state's conflict of law principles. *Mills v. Hoflich*, 465 F.2d 29, 30–31 (10th Cir.1972).

Second, the express and unambiguous wording of the parties' choice of law provision reveals only an agreement as to what law would govern their contract, rather than any agreement on what law should apply to tort claims arising from the circumstances of their contractual relationship. Consequently, the policy discussion found in *Coastal Steel v. Tilghman Wheelabrator Ltd.*, 709 F.2d 190, 193, 203 (3rd Cir.), *cert. denied*, 464 U.S. 938, 104 S.Ct. 349, 78 L.Ed.2d 315 (1983), is of limited significance, since the forum selection clause there expressly applied to "any dispute arising" between the parties and the court found no evidence to suggest that the clause was not intended to address all claims emerging from the contractual relationship.

Finally, of the courts which have confronted the application of a contract choice of law provision to related tort claims, most have separated the contract and tort claims with only the former being controlled by the choice of law provisions. *E.g. Consol. Data Term. v. Applied Digital Data Systems*, 708 F.2d 385, 390 n. 3 (9th Cir.1983) (The tort claims were segregated from the contract claims which were governed by

the contract choice of law provision found in the distributorship agreement); *Invacare Corp. v. Sperry Corp.*, 612 F.Supp. 448, 451 n. 4 (D.Ohio 1984) ("[C]hoice of law provision only applies to the claim for breach of contract...."); *Computerized Radiological Services v. Syntex Corp.*, 595 F.Supp. 1495, 1503 (E.D.N.Y.1985), *modified on other grounds*, 786 F.2d 72 (2nd Cir.1986). ("[A] tort claim arising out of the contract may be governed by the law of a different forum" than that chosen by the parties). Those courts which have applied the contract choice of law provisions to the related tort claims did so without offering any substantial rationale or discussion. *Continental Illinois National Bank and Trust Co. of Chicago v. Premier Systems, Inc.*, No. 88–C–7703, 1989 WL 24122 (N.D. Ill.1989) (1989 U.S.Dist.Lexis 2664); *Jaskey Finance and Leasing v. Display Data Corp.*, 564 F.Supp. 160, 165–66 (E.D.Pa. 1983). The defendant's position in this case could only be followed if this court were to ignore to some extent, and in some instances entirely, the settled law of Kansas, the express wording of the parties' agreement, and the articulated majority position taken by other courts. Because Kansas law governs plaintiff's tort claims, defendant's motion to dismiss plaintiff's claim for punitive damages is denied.

## DISCLAIMER OF WARRANTIES

Defendant contends that by the terms of the Basic Agreement it has properly disclaimed all express and implied warranties other than the express warranty against defects in material or workmanship found in the agreement. Behind the force of this disclaimer and the argued absence of any plaintiff's claim for breach of the express warranty found in the Basic Agreement, defendant asks for the dismissal of plaintiff's claims for breach of express and implied warranties. In its original responsive brief, plaintiff only argued that factual issues remained on whether defendant's limited remedy of repair or replacement had failed of its essential purpose. In its supplemental response, plaintiff makes a cursory reference to the defense of over-reaching and then later outlines its warranty claims so as to include a claim for breach of the express warranty of material and workmanship.

Mass.Gen.L. ch. 106, § 2–316(1) limits the circumstances under which express warranties may be excluded. This same provision is expressly subject to the parol evidence rule found at Mass.Gen.L. ch. 106, § 2–202. As a result, if the final integrated written expression contains a clause disclaiming all express and implied warranties, any prior or contemporaneous oral express warranties are effectively excluded. *Agristor Leasing v. Meuli*, 634 F.Supp. 1208, 1219 (D.Kan.1986); B. Clark and C. Smith, *The Law of Product Warranties*, ¶ 8.02[3] (1984). Regarding implied warranties, Mass.Gen.L. ch. 106, § 2–316(2) sets forth the requirements for their exclusion—conspicuous and in writing. Plaintiff does not challenge this disclaimer on either requirement.

Plaintiff's apparent impression of the law is that when a limited remedy fails of its essential purpose the disclaimed warranties are revived. This view confuses the distinction made in the Code between disclaimers of warranties (2–316) and limitations of remedies (2–719). Though related, these concepts are different in that disclaimers attempt to limit the circumstances of liability while remedy limitations restrict the buyer to certain forms of relief. Clark, *Product Warranties*, ¶ 8.01. When a limited remedy fails of its essential purpose, 2–719(2) abrogates only the remedy limitation and not the warranty disclaimers. This distinction is further emphasized in the official comment 3 to 2–719, where after explaining that clauses limiting consequential damages may be unconscionable, it states: "The seller in all cases is free to disclaim warranties in the manner provided in Section 2–316." Consequently, disclaimers valid under 2–316 are also valid under 2–719. *Hall v. Shearson Lehman Hutton, Inc.*, 708 F.Supp. 711, 712 (D.Md.1989). Despite any argument that the limited remedy failed of its essential purpose, plaintiff is bound by the written exclusion of the express and implied warranties, and its only warranty claim is based on the ex-

press warranty in the Basic Agreement against defects in material and workmanship.

## LIMITATION OF REMEDIES

Notwithstanding the clause in the Basic Agreement barring defendant's liability for consequential damages arising out of the agreement or use of the purchased equipment, plaintiff seeks to recover its consequential and incidental damages on the breach of express warranty and tort claims for the argued reason that the defendant's limited repair and replacement remedy allegedly failed of its essential purpose. Ritchie believes it has exhausted the limited remedy of repair without the system being brought into conformance with the warranty. Ritchie also contends consequential damages should become available based upon Honeywell's bad faith effort at repairs, the substantial loss suffered by Ritchie, the relationship between Ritchie and Honeywell, and Honeywell's knowledge and involvement in Ritchie's purpose for the purchase. Honeywell responds that the agreed remedy was not limited to repair but included return of the purchase price. In addition, Honeywell considers the majority rule to be that a clause excluding consequential damages is still enforceable when the limited remedy has failed of its essential purpose.

As revealed in the official comment 1 to section 2–719, the Code intended to leave the parties "free to shape their remedies to their particular requirements...." One constraint to this freedom to contract is found in 2–719(2), which provides: "Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this act." Another restriction is found at 2–719(3), which states: "Consequential damages may be limited or excluded unless the limitation or exclusion is unconscionable. Limitation of consequential damages for injury to the person in the case of consumer goods is prima facie unconscionable but limitation of damages where the loss is commercial is not." The policy behind these constraints is that "minimum adequate remedies" must be available under the sales contract. Official Comm. 1, § 2–719.

Analysis of a 2–719(2) issue entails determining the purpose of the agreed limited remedy and whether the remedy has failed to achieve that purpose. *Chatlos Systems v. National Cash Register Corp.*, 635 F.2d 1081, 1085 (3rd Cir.1980), *cert. dismissed*, 457 U.S. 1112, 102 S.Ct. 2918, 73 L.Ed.2d 1323 (1982); *see Kathenes v. Quick Chek Food Stores*, 596 F.Supp. 713, 717 (D.N.J.1984), and *Ritchie Sand, Inc. v. Eagle Iron Works*, No. 87–1385–C (D.Kan. March 14, 1989) (1989 Westlaw 31408). The remedy of repair and replacement offers the seller an opportunity to cure defects and to minimize its liability exposure, *Chatlos Systems*, 635 F.2d at 1085, and provides the buyer with goods which conform to the contract within a reasonable period of time. *Murray v. Holiday Rambler, Inc.*, 83 Wis.2d 406, 418, 265 N.W.2d 513 (1978). Courts have found this limited remedy to have failed under circumstances where the defects were latent and undiscoverable after a reasonable inspection, *see Lewis Refrig. v. Sawyer Fruit, Veg. & Cold Storage*, 709 F.2d 427, 432 (6th Cir. 1983); *Marr Enterprises, Inc. v. Lewis Refrigeration Co.*, 556 F.2d 951, 955 (9th Cir.1977), or where repairs were unreasonably delayed or never effectively made, *Milgard Tempering, Inc. v. Selas Corp. of America*, 761 F.2d 553, 556 (9th Cir.1985). In other words, when unexpected circumstances presently prevent the agreed remedy from yielding its purported and expected relief then the remedy has failed of *its* essential purpose. *See* J. White and R. Summers, *Handbook of the Law under the Uniform Commercial Code*, § 12–10 at 466 (2d ed. 1980). Accordingly, a limited remedy will not necessarily have failed of its purpose merely because it did not cover all of the buyer's damages from the breach of warranty. *Hill v. BASF Wyandotte Corp.*, 696 F.2d 287, 292 (4th Cir.1982).

Whether circumstances show the limited remedy to have failed of its essential purpose is generally considered to be a question of fact. *Alloy Computer Products v.*

*Northern Telecom,* 683 F.Supp. 12, 15 n. 4 (D.Mass.1988). As a result, courts have usually assumed at the summary judgment level that the remedy of repair or replacement has failed and then have gone on to consider whether a consequential damages exclusion remains independently enforceable. *Milgard Tempering,* 761 F.2d at 556; *Cole Energy Development Co. v. Ingersoll–Rand Co.,* 678 F.Supp. 208, 210 (D.Ill. 1988).

■ Although material factual issues exist as to whether the repair or replacement remedy has failed, the case *sub judice* is unique in that the Basic Agreement also provides for a backup remedy of actual damages not to exceed the purchase price if Honeywell, after repeated attempts, is unable to repair the defective part. On the subject of backup remedies, one leading commentator has observed:

> Although an occasional decision holds that return of the purchase price is a remedy that fails of its essential purpose if the consequential damages far exceed that amount, these cases misread Section 2–719(2) and confuse the concepts of unconscionability with failure of essential purpose. The better reasoned decisions hold that refund of the purchase price prevents a limited remedy from failing of its essential purpose....
>
> A backup remedy providing the aggrieved buyer with a replacement unit free from defects should blunt the argument that the repair-or-replace remedy has failed of its essential purpose. Or to put the matter another way, the backup remedy does not fail of its essential purpose even though the front-line remedy does....
>
> Of course the backup remedy may also fail of its essential purpose. For example, the seller may refuse to refund the purchase price after failure of the front-line repair-or-replacement remedy. Or the seller might conceal facts regarding the breach of warranty until such time that rescission by the buyer could not be pursued as a backup remedy because it would cause severe financial strain.

Clark, *The Law of Product Warranties,* ¶ 8.04[2][d] at 8–60—8–61 (footnotes omitted). In *Marr Enterprises,* the Ninth Circuit affirmed the district court's grant of summary judgment for the seller on all of the buyer's claims except for return of the purchase price. Even though the seller was unable to repair or replace the defective parts, the Ninth Circuit considered the additional agreed remedy, refund of purchase price, to have not failed as a matter of law. 556 F.2d at 955. Similar approaches and results are found in *Garden State Food v. Sperry Rand Corp.,* 512 F.Supp. 975, 978 (D.N.J.1981), and *Computerized Radiological Services,* 595 F.Supp. at 1510.

Plaintiff has not come forth with any facts to show this backup remedy was denied them or to evidence defendant's concealment of facts which essentially made this remedy financially both unavailable and impracticable because of plaintiff's business commitment to the defective product. The facts show, instead, the plaintiff pulled the plug on the Honeywell system after six months of unsuccessful testing and then purchased and installed an IBM computer to run the same order entry system. The limited remedies set forth in the Basic Agreement have not failed of their essential purpose, and plaintiff's damages for breach of the express warranty of material and workmanship are limited to the actual damages not to exceed the purchase price of the Honeywell system.

■ Even if the court were to assume that the limited remedies failed of their essential purpose, the separate and independent clause excluding consequential damages would still be valid. Massachusetts law appears to employ the case-by-case approach in determining whether a consequential damage exclusion is operative when the limited remedy has failed. *Andover Air Limited Partnership v. Piper Aircraft Corp,* No. 87–0532–Z (D.Mass. Jan. 4, 1989) (7 UCC Rep.Serv.2d 1494, 1503–04). The court there concluded that seller's unjustified refusal to honor its obligations to repair or replace barred, in all fairness, the seller from claiming its advan-

tage in the trade, the exclusion of consequential damages. *Id.*

The case-by-case approach requires an evaluation of the relative bargaining strength of the parties and the allocation of risks reflected by the specific terms of the agreement. *Chatlos Systems,* 635 F.2d at 1087; *S.M. Wilson & Co. v. Smith Intern., Inc.,* 587 F.2d 1363, 1375 (9th Cir.1978); *Cole Energy,* 678 F.Supp. at 21. It cannot be seriously disputed that plaintiff is a sophisticated commercial enterprise having substantially equal bargaining strength to the defendant. Plaintiff employed legal counsel to review the agreements and even proposed certain changes regarding the risks associated with passing of title which were later accepted by Honeywell and made a part of the agreement. The clause excluding defendant's liability for consequential damages is clear and unambiguous. The equipment sold plaintiff was complex. Honeywell did not completely ignore its obligation to repair, even though the degree of those efforts may be a contested fact. The parties agreed to the type of a backup remedy which courts have upheld as a minimum adequate remedy. *Cole Energy,* 678 F.Supp. at 212 (and cases cited therein); *Computerized Radiological,* 595 F.Supp. at 1510. *See Kaplan v. RCA Corp.,* 783 F.2d 463, 467 (4th Cir.1986). Under these circumstances, the court is compelled to enforce the agreement according to its written terms, since it represents the parties' freely negotiated allocation of risks.

There are no facts upon which this court could find the consequential damage exclusion to be unconscionable pursuant to 2–719(3). The same factors noted immediately above also demonstrate that the exclusionary clause is not unconscionable. *See Transamerica Oil Corp. v. Lynes, Inc.,* 723 F.2d 758, 764 (10th Cir.1983). There is nothing to evidence oppression or unfair surprise. The possibilities that a computer system will not meet the buyer's needs and business opportunities consequently will be lost are inherent risks that the parties as experienced commercial entities must be presumed to have known and allocated by their agreement, in the absence of conflict-

ing evidence. Public interest is better served when the courts look to the agreements between commercial entities in determining the allocation of risks. *Werner & Pfleiderer Corp. v. Gary Chemical Corp.,* 697 F.Supp. 808, 813 (D.N.J.1988). In a similar vein, Justice Fontron eloquently stated:

> The policy of the law in general is to permit mentally competent parties to arrange their own contracts and fashion their own remedies where no fraud or overreaching is practiced. Contracts freely arrived at and fairly made are favorites of the law. (Citation omitted). None of the parties here involved were neophytes or babes in the brambles of the business world. Both companies, it would appear, dealt in projects involving considerable sums of money; both operated substantial business enterprises; and there is no suggestion that their businesses were not capably managed and profitably operated. The trial court did not find the limitation on damages imposed by the exculpatory clause was unconscionable, and we cannot view it as such. The limitation imposed was not total and was agreed upon by parties standing on equal footing.

*Kansas City Structural Steel Co. v. L.G. Barcus & Sons, Inc.,* 217 Kan. 88, 95, 535 P.2d 419 (1975). The consequential damages exclusion clause in the Basic Agreement is valid.

## NEGLIGENT MISREPRESENTATION

Defendant contends this tort claim of plaintiff's is simply a disguised breach of warranty claim brought in an apparent effort to circumvent the restricting terms of the contract. Defendant cites decisions from jurisdictions other than Kansas which have held that a claim for negligent misrepresentation is not viable in a product sales context where the sales contract disclaims prior representations and warranties. *See Isler v. Texas Oil & Gas Corp.,* 749 F.2d 22, 23–24 (10th Cir.1984) (New Mexico law); *United States Welding, Inc. v. Burroughs Corp.,* 640 F.Supp. 350, 352–353 (D.Colo. 1985) (Colorado law); *Rio Grande Jewelers*

*Supply, Inc. v. Data General Corp.*, 101 N.M. 798, 689 P.2d 1269 (N.M.1984) (New Mexico law); *Black, Jackson and Simmons Insurance Brokerage, Inc. v. IBM Corp.*, 109 Ill.App.3d 132, 64 Ill.Dec. 730, 440 N.E.2d 282 (1982) (Illinois law). Plaintiff responds that Kansas courts have recognized the tort of negligent misrepresentation and that in the decisions cited by defendant the courts have confused the actions of innocent and negligent misrepresentation.

■ This court is persuaded that the Kansas Supreme Court would follow the reasoning and holdings in *Isler* and *Burroughs* and strike down a negligent misrepresentation claim in a product sales context where the integrated purchase contract specifically disclaims prior representations and warranties. The Kansas Supreme Court in *Ford Motor Cred. Co. v. Suburban Ford*, 237 Kan. 195, 203–04, 699 P.2d 992, *cert. denied*, 474 U.S. 995, 106 S.Ct. 409, 88 L.Ed.2d 360 (1985), quoted with approval from the *Isler* decision, as follows in part:

> The very notion of contract is the consensual formation of relationships with bargained-for duties. An essential corollary of the concept of bargained-for duties is bargained-for liabilities for failure to perform them.
>
> ... The effect of confusing the concept of contractual duties, which are voluntarily bargained for, with the concept of tort duties, which are largely imposed by law, would be to nullify a substantial part of what the parties expressly bargained for—limited liability.... The careless and unnecessary blanket confusion of tort and contract would undermine the carefully evolved utility of both.
>
> In tort, the legislatures and the courts have set the parameters of social policy and imposed them on individual members of society without their consent. The social policy in the field of contract have been left to the parties themselves to determine, with judicial and legislative intervention tolerated only in the most extreme cases....

> Further, it should not matter whether the breach of a bargained-for duty arises from inattention, a disagreement over the existence of the duty, a dispute over the nature of the duty, or a simple unwillingness to perform the duty. The parties by contract ... have themselves defined the consequences of the breach. In the marketplace of contract, a breach is a breach is a breach—unless the parties choose to specify otherwise.
>
> ... [T]he facts alleged in plaintiff's tort claim are precisely the same as those alleged in their contract claim. Because the contract specifically defined the rights and duties of the parties regarding rental payments and notice, thereby precluding any extracontractual tort duty regarding such payments, we must reverse the judgment for plaintiffs sounding in tort.

237 Kan. at 203–04, 699 P.2d 992 (quoting *Isler*, 749 F.2d at 23–24). The Kansas Supreme Court relied on this reasoning and found the trial court had erred in submitting tort claims to the jury for conduct by defendant expressly allowed by the parties' agreement. 237 Kan. at 205, 699 P.2d 992. The Kansas Supreme Court cannot logically espouse the expansive reasoning in *Isler* without sometime later also adopting its conclusion that a negligence claim cannot be maintained on the same conduct governed by the parties' contract which specifies the consequences of such a breach. There is no Kansas decision to date recognizing a claim for negligent misrepresentation in the context of a product sales contract. For these reasons, the court adopts the holdings in *Isler* and *Burroughs*.

Applying those decisions to the present case, the court concludes the plaintiff's negligent misrepresentation claim is not valid. The Basic Agreement contains an integration clause stating that it represents the parties' entire agreement and "supersedes all prior oral and written proposals and communications." Similar to *Burroughs*, the Basic Agreement effectively disclaims all express and limited warranties. Finally, plaintiff's alleged negligent misrepresentations appear to be the same representations upon which plaintiff bases

its warranty claims that the court has since dismissed by reason of the disclaimer. Plaintiff asserts that its "allegations for negligent misrepresentation in the present case are different than plaintiff's breach of warranty claims." (Dk. 54 at 34). The court is unsure of what plaintiff intended by this statement, since plaintiff does not expressly argue its tort claim is based on alleged *misrepresentations* by defendant which differ from the alleged *representations* serving as the factual basis of plaintiff's warranty claims. Plaintiff also offers no explanation nor example for this ambiguous assertion. From its reading of the pretrial order, the court finds the representations or misrepresentations underlying the plaintiff's claims for negligent misrepresentation and breach of warranty are in most instances identical, and, therefore, the holdings in *Isler, Rio Grande,* and *Burroughs* are applicable to those negligent misrepresentation claims.

 Plaintiff's remaining negligent misrepresentation claims also must be dismissed on the strength of defendant's other argument that the law is well settled that a negligence action is unavailable if only economic losses are sought and that any liability and damages are dictated by contract principles. *See Daitom, Inc. v. Pennwalt Corp.,* 741 F.2d 1569, 1581 (10th Cir.1984); *Owens–Corning Fiberglas v. Sonic Development Corp.,* 546 F.Supp. 533, 541–42 (D.Kan.1982); *Haysville U.S.D. No. 261 v. GAF Corp.,* 233 Kan. 635, 643, 666 P.2d 192 (1983). Plaintiff has not responded to this sound argument of the defendant. Defendant's motion is granted on plaintiff's negligent misrepresentation claims.

## GOOD FAITH AND FAIR DEALING

 Defendant's argument on this subject is twofold. If plaintiff's action is for breach of the contractual duty of good faith and fair dealing, defendant contends the claim should be subject to the same remedy limitations discussed in plaintiff's other contract actions. If plaintiff's action is in tort for breach of the implied covenant of good faith, defendant contends neither

Massachusetts nor Kansas recognizes such a claim in a commercial setting. Based on prior rulings in this order and the lack of any new challenges by plaintiff, the defendant's first contention is sustained. The court has reviewed the pretrial order and the only mention of a claim concerning the breach of the implied covenant of good faith and fair dealing appears in Issue No. 7 which explicitly refers to Code provision 1–203, rather than any independent duty imposed by law and actionable in tort. Even if plaintiff had stated such a tort claim, Kansas courts have not recognized this tort in a commercial contract setting. *Budget Rent A Car of Kansas, Inc. v. Southwestern Bell Telephone Company,* 782 P.2d 75 (Kan.App.1989) (citing *Malone v. University of Kansas Medical Center,* 220 Kan. 371, 374, 552 P.2d 885 (1976)). *See also Bresson v. Mixer,* No. 56,274 unpub. (Kan. June 21, 1985) (citing *Guarantee Abstract & Title Co. v. Interstate Fire & Cas. Co.,* 232 Kan. 76, Syl. ¶¶ 2, 3, 652 P.2d 665 (1982)). Defendant's motion is granted on these claims.

## BREACH OF FIDUCIARY DUTY

 Plaintiff claims the relationship between it and defendant was one of trust and confidence giving rise to fiduciary duties. Defendant argues the evidence of record is insufficient for this claim to survive the challenge of summary judgment. Plaintiff responds that this issue is one of fact and that based upon their statement of facts this claim should be submitted to the jury. Plaintiff also refers to Kansas law on the fiduciary relationship existing as a result of a joint venture.

In determining what constitutes a fiduciary relationship, the Kansas Supreme Court, rather than performing the impossible task of providing an all encompassing definition of a fiduciary relation, has chosen to identify common characteristics and attributes of such a relationship and to articulate broad equitable principles for judicial consideration. *Brown v. Foulks,* 232 Kan. 424, 430, 657 P.2d 501 (1983). Whether a fiduciary relationship exists is a question of fact decided from the facts and

circumstances of each case. *Olson v. Harshman,* 233 Kan. 1055, 1057, 668 P.2d 147 (1983). In *Olson,* the court set forth some of the governing law found in their earlier decisions:

> It may be said that generally there are two types of fiduciary relationships: (1) those specifically created by contract such as principal and agent ..., and (2) those implied in law due to the factual situation surrounding the involved transactions and the relationship of the parties to each other and to the questioned transactions....
>
> ....
>
> A fiduciary relationship imparts a position of *peculiar confidence placed by one individual in another.* A fiduciary is a person with a duty to *act primarily for the benefit of another.* A fiduciary is in a position to have and exercise, and does *have and exercise influence over another.* A fiduciary relationship implies a condition of *superiority of one of the parties over the other.* Generally, in a fiduciary relationship, the property, interest or authority of the other is *placed in the charge of the fiduciary.* (Citation omitted).
>
> ....
>
> ... [I]t extends to every possible case in which a fiduciary relation exists in fact, and in which there is *confidence reposed* on one side *and resulting domination and influence* on the other. (Citation omitted).
>
> ....
>
> There is no invariable rule which determines the existence of a fiduciary relationship, but it is manifest in all the decisions that there must be not only confidence of the one in the other, but there must exist a certain inequality, dependence, weakness of age, of mental strength, business intelligence, knowledge of the facts involved, or other conditions, *giving to one advantage over the other.* (Citations omitted).

233 Kan. at 1058, 668 P.2d 147 (quoting *Denison State Bank v. Madeira,* 230 Kan. 684, 691–92, 640 P.2d 1235 (1982)) (emphasis in original). If the parties had agreed to a joint venture, a fiduciary relationship would exist by virtue of the first category since partnership law governs joint ventures. *Rajala v. Allied Corp.,* 66 B.R. 582, 598 (D.Kan.1986). If there is no evidence of a joint venture, then the possibility of a fiduciary relationship under the second category must be considered.

A joint venture is " 'an association of two or more persons to carry out a single business enterprise for profit.' " *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.,* 226 Kan. 70, 75, 596 P.2d 816 (1979) (quoting *Stricklin v. Parsons Stockyard Co.,* 192 Kan. 360, 363, 388 P.2d 824 (1964). The participants must have the requisite intent to associate as evidenced by an express agreement or one implied from the mutual acts and conduct of the parties. *Id.* Plaintiff contends that Honeywell's effort to sell its computer system to Ashgrove Cement by demonstrating plaintiff's order entry system software and also by allowing Ritchie to negotiate its own sale of plaintiff's software to Ashgrove show mutual "plans for marketing the two systems together in the future as a joint venturer." (Dk. 54 at 44). The court does not understand the statements found in Deposition Exhibit 90 and the corresponding deposition cites to reveal any express or implied agreement to associate. Furthermore, the fact that plans may have existed for future marketing does not go to establishing a present joint venture agreement.

Plaintiff has not come forth with enough evidence for a reasonable jury to find a fiduciary relationship based upon the surrounding circumstances. "[A] buyer/seller relationship does not create a fiduciary duty because the parties are dealing at arm's length and seeking for themselves the best advantage." *Rajala,* 66 B.R. at 599 (citing *Nifty Foods Corp. v. Great Atlantic & Pac. Tea Co.,* 614 F.2d 832, 838 (2d Cir.1980)). "Undoubtedly, parties may deal at arm's length for their mutual profit. It is only when, by their concerted action, they willingly and knowingly act for one another in a manner to impose mutual trust and confidence that a fiduciary relationship arises." *Paul v. Smith,* 191 Kan. 163, 170, 380 P.2d 421 (1963). The only reasonable

inference to be drawn from the facts is that the parties' contract was the result of arm's-length negotiations. The involvement of plaintiff's attorneys in negotiations, the solicitation of bids from other competing companies, the maintaining of a written record of all communications with defendant, the tape-recording of certain conversations with defendant and the careful and methodical steps taken by the data processing committee in deciding on the Honeywell system are uncontroverted facts which convincingly defeat any notion that plaintiff placed peculiar confidence and trust in defendant and implicitly authorized defendant to act on plaintiff's behalf. Whether or not Ritchie employees placed their confidence in Mr. Loether of Honeywell because of their past working and social relationships with him or whether or not Honeywell aggressively worked and cooperated with Ritchie personnel in an effort to sell them this system, these facts cannot reasonably transform this transaction into anything other than what it is, an arm's-length sale of computer equipment facilitated by a business contact and good salesmanship.

Since it almost goes without saying that the seller of a product will likely know more about its features and capabilities than would the buyer, this superior knowledge is hardly a basis for grounding a fiduciary relationship. "One may not abandon all caution and responsibility for his own protection and unilaterally impose a fiduciary relationship on another without a conscious assumption of such duties by the one sought to be held liable as a fiduciary." *Denison State Bank,* 230 Kan. at 696, 640 P.2d 1235. This court is unwilling to radically alter the given scheme of commercial dealings by the possible imposition of a fiduciary relationship upon a seller under these circumstances.

### FRAUD

 After the contract was signed, plaintiff alleges the defendant misrepresented and concealed certain facts concerning other problems with the system, the availability of software to solve the problems, the capacity of the system to meet Ritchie's needs, and the operation of new patches. Plaintiff considers these misrepresentations and concealments to be separately actionable in that Ritchie, instead of terminating the contract, was induced by them to devote its staff and funds for further attempts to correct a system which was irreparable. Defendant argues the post-sale representations are not separately actionable, as plaintiff's alleged injuries are the result of purchasing the computer, and as plaintiff is unable to show any detrimental reliance on these representations.

Fraud encompasses "anything calculated to deceive, including all acts, omissions, and concealments involving a breach of legal or equitable duty, trust, or confidence resulting in damage to another." *Goben v. Barry,* 234 Kan. 721, Syl. ¶ 8, 676 P.2d 90 (1984). Fraud is proven when clear and convincing evidence supports each of these elements: (1) An untrue representation of a material fact; (2) The party making the representation knows it to be untrue, or has a reckless disregard of its truth; (3) The party alleging fraud justifiably relied upon the statement; and (4) The party alleging fraud was damaged as a result of the reliance. *Slaymaker v. Westgate State Bank,* 241 Kan. 525, 531, 739 P.2d 444 (1987); *Hutchinson Travel Agency, Inc. v. McGregor,* 10 Kan.App.2d 461, 463–64, 701 P.2d 977, *rev. denied,* 238 Kan. 877 (1985).

The injured party's reliance "must be reasonable, justifiable and detrimental." *Hutchinson Travel,* 10 Kan.App.2d at 464, 701 P.2d 977. The reliance element acts as the causation in fact, in that the misrepresentation causes the alleging party to act or to refrain from acting to his advantage. *Tetuan v. A.H. Robins Co.,* 241 Kan. 441, 468, 738 P.2d 1210 (1987). "The false representation must play a 'material and substantial part' in causing another to adopt a particular course of conduct." *Id.* (quoting Prosser, Law of Torts § 108, p. 714 (4th ed. 1971)). The misrepresentation need not be the sole cause, as it is enough for the plaintiff to show that absent the misrepresentation he would not have acted to his disadvantage. *Slaymaker,* 241 Kan. at 532, 739 P.2d 444.

In *Breeding Association v. Scott*, 53 Kan. 534, 536, 36 P. 978 (1894), the Kansas Supreme Court held that fraudulent representations "made by a seller after a contract of sale has been consummated are not actionable." The court found that any representations concerning the quality of the purchased item could not have been relied upon by the buyers, or have been an inducement to a purchase already made. *Id.* False representations regarding whether an individual is a good credit risk are not actionable when they are made after the credit has been extended. *Todd v. Wichita Federal Savings & Loan Ass'n*, 184 Kan. 492, 495, 337 P.2d 648 (1959). The court went on to state in *Todd:* "The petition contained no allegation that subsequent to the making of the false representations plaintiffs, to their detriment, forewent or refrained from asserting some existing right, or that, as a result of the false representations, they changed their position in any manner." *Id.*

Plaintiff alleges that in reliance upon these fraudulent post-sale misrepresentations the planned one-month testing period was extended to six months at its expense and, consequently, it forewent terminating the contract for earlier fraudulent misrepresentations. Defendant has not shown this reliance by plaintiff to be without factual support or to be a manner of damages not cognizable under the law. Defendant's motion is denied on this issue.

IT IS THEREFORE ORDERED that defendant's motion for partial summary judgment is granted on the plaintiff's warranty claims disclaimed by the Basic Agreement, the plaintiff's request for consequential damages on its remaining express warranty claim and breach of good faith and fair dealing claim, the plaintiff's negligent misrepresentation claims, the plaintiff's claim for tortious breach of the implied covenant of good faith, and the plaintiff's breach of fiduciary duty claim.

IT IS FURTHER ORDERED that defendant's motion is denied as to plaintiff's request for punitive damages on its fraud claims and as to plaintiff's fraud claims for post-sale representations.